**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL NO. 04-250 (JAG)** |
| **ADRIAN ARMSTRONG [2],** | |
| **Defendant.** | |

**REPORT AND RECOMMENDATION**

**INTRODUCTION**

On May 17, 2007, defendant Adrian Armstrong ("Armstrong") filed a "Motion to Dismiss the Indictment and/or Exclusion/Suppression of Evidence" arguing outrageous government misconduct in this case by a cooperating individual, Alexander Young Duffis ("Young Duffis"), who was under the supervision of DEA agents.  Armstrong claims in his motion that Young Duffis was engaged in drug trafficking and money laundering and the evidence against defendant consists solely of the testimony of Young Duffis based on consensual recordings he allegedly made of defendant.  These recordings have been identified as N-17, N-18 and N-22. Defendant makes reference to having retained an expert James A. Griffin ("Griffin") who did an analysis of the consensual recordings and concluded the tapes in question have been tampered with. Defendant requests the dismissal of the indictment or in the alternative the suppression of the evidence in question.  (Docket No. 146).

On May 21, 2007, the above motion was referred to the undersigned for report and recommendation.  (Docket Nos. 147 and 148).

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 2

After several procedural matters related to defendant's bail, defendant filed on July 26, 2007 a "Request for an Order Granting Defendant's Motion to Dismiss or for Exclusion/Suppression of Evidence" (Docket No. 172).[1]

On July 30, 2007, the government filed an "Opposition to Motion to Dismiss" indicating the report of its expert witness was not ready and could not file its opposition to the motion to suppress without said report. (Docket No. 173).

On October 9, 2007, the suppression hearing was held in which defendant called Griffin as his expert witness and both of his expert reports were admitted into evidence. (Exhibits A and B). The government called as its expert witness, Agent Ryan Johnson ("Johnson"), and his expert report was admitted into evidence (Exhibit 1). Counsel for the government and for defendant requested holding the hearing in abeyance so that the government could hire an expert on magnetic development, at which time the government would inform the Court of possible dates for the continuation of the hearing. Defendant informed at that time he was waiving the speedy trial. (Docket No. 198).

After several months, the government submitted a new expert report by Barry Dickey ("Dickey") dated April 21, 2008 who was retained as a forensic expert to assess the authenticity and integrity of the tapes in question.

---

[1] The "Motion to Dismiss" was also referred to the undersigned for report and recommendation. (Docket No. 183).

On May 21, 2008, defendant filed a "Motion to Supplement Defendant's Motion to Dismiss or for Exclusion/Suppression of Evidence" including a supplemental report of defendant's expert Griffin submitted on March 3, 2008. (Docket No. 225).[2]

On June 9, 2008, the government filed its "Response to Defendant's Supplemental Motion to Dismiss" in response to Docket Nos. 146 and 225. The government informed a hearing should be held as to tape N-17. Regarding tapes N-18 and N-22, the government submitted that no hearing was needed on these two items because the government was not going to introduce N-18 into evidence[3]. In relation to N-22, the government submitted there were no anomalies found on this recording, thus, it should be admitted into evidence. (Docket No. 232).

On September 25, 2008, the further suppression hearing was held only in relation to N-17, as agreed by the parties. The government called as its next expert witness, Dickey, and his report was admitted into evidence. (Exhibit 4). The defense recalled to the witness stand expert Griffin. After hearing the testimonies presented, the Court ordered the transcript of the hearing. Once the transcript was received, the government would have ten (10) days to file its post-hearing memorandum and defendant would have ten (10) days, thereafter, to file his reply. (Docket No. 242).

On October 8, 2008, the transcript of the September 25th hearing was filed. (Docket No. 243). After requesting several extensions of time, the government filed its "Summary

---

[2] This supplemental Motion was also referred to the undersigned for report and recommendation. (Docket No. 229).

[3] Pursuant to the Dickey's expert opinion, N-18 is not an original but the result of acoustically coupled and/or electronically connected transfers facilitated through the use of multiple playback devices. N-18 contains several anomalies which question the integrity of the entire recording. The segments existing on N-18 are not consistent with event(s) and/or dialogue in a continuous and reliable manner. (Exhibits 3 and 4).

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 4

Opposition to Defendant's Motion to Dismiss" on November 3, 2008.  The government argued the sole issue before the court is whether N-17 should be admissible at defendant's trial.  The government moved the court to deny defendant's request to suppress N-17 based on the testimony of Dickey and his findings. (Docket No. 248).

On December 15, 2008, defendant filed his "Memorandum in Support of Motion to Dismiss and/or Exclusion/Suppression of Evidence" summarizing the proceedings, defendant's arguments and grounds for dismissal of the indictment and the suppression of N-17.  (Docket No. 255).

The undersigned is now in a position to issue this report and recommendation after the parties filed their post-hearing briefs.

### SUMMARY OF EVIDENCE PRESENTED AT EVIDENTIARY HEARINGS[4]

**A.      TESTIMONY OF GRIFFIN ON BEHALF OF DEFENDANT:**

Griffin testified as to his conclusions and opinions regarding the consensual tapes in question explaining the process of his forensic analysis and the conclusions he reached after his examination. Regarding tape N-17,  he found that there is a break in the recording after three minutes-thirty four seconds which was the result of the recorder being stopped and re-started during the original recording event creating a gap in the conversation. This stop/start could also be the result of later editing of the tape. Griffin also found that the recording in N-17 appears to end abruptly before the conversation is concluded (Tr. 10/09/07, pp. 11 thru 13; Exhibit B - Report of March 26, 2007).  He also concluded that

---

[4] The only suppression issue pending before the court is the suppression of tape N-17 because the government has indicated it will not use N-18 as evidence at trial.  As to N-22, there are no anomalies and, thus, it should be admissible at trial.  Thus, the summary of the evidence only includes the testimony of the expert witnesses pertinent to tape N-17.

the words "December 27, 2003" had been erased in the tape and that the erasure was done

using the recorder which was submitted to him by the DEA as the recorder which was used

to record the original. (Tr. 10-09-07, p. 18). He confirmed that for N-17 there is a break in

the middle of the recording, likely the result of stop and start or the possibility of later

editing or over recording.(See Tr. 10-09-07, pp. 16 thru 22).

**B.      TESTIMONY OF JOHNSON ON BEHALF OF THE GOVERNMENT:**

        Johnson testified that for his forensic analysis he performed critical listening,

waveform analysis, spectrographic and spectrum analysis. (Tr. 10/09/07, p. 70). Regarding

tape N-17, he agreed that there was stop-start at three minutes thirty-four seconds, and that

there is no way to determine the length of the stop-start. (Tr. 10-09-07, p. 72 thru 80).

Johnson agreed with Griffin that tape N-17 ended abruptly after seven minutes four seconds

(Tr. 10/09/07, p. 80).  (Exhibit 1).

**C.      TESTIMONY OF DICKEY ON BEHALF OF THE GOVERNMENT:**

        The following are the steps and results of the examination of exhibit N-17 performed

by Dickey as summarized in his expert report.  (See Exhibit 4).  Evaluation of the section

located at approx. {00:02} verified the low-level speech, "December 27, 2003". At approx.

{00:05}, a transient is present and coincides with an increase of volume. The subsequent

speech suggests the completion/continuation of the header. Further evaluation (MD) of this

portion did disclose an EH similar to that of EQ-1; however, a corresponding RH could not

be identified. Review of the record/erasure exemplars created by EQ-1 disclosed complete

RH/EH patterns. Comparative analysis of the depth of erasure associated with EQ-1 did not

support the existence of residual speech when operating properly. To the contrary, results

suggest that erasure would have adequately dispersed any existing fields. Therefore, other plausible explanations should be considered, including the possibility that the recorder did not function properly during activation or that some failure may have momentarily occurred. At approx. {00:23}, a rec/pause event is present at the end of the header and coincides with the start of conversation. At approx. {03:34}, a stop/start event occurs. The amount of time, which elapsed during deactivation, cannot be estimated. The conversation ends abruptly at approx. {07:04}. Based on the examination of N-17, Dickey opines that the recording(s) are original and were created by EQ-1 or a device of similar head configuration/electronics. N-17 contains {2} two anomalies which question its integrity as a continuous recording of a single conversation. The segments existing between {00:23 – 03:34} and {03:34 – 07:04} are independently continuous. However, the complete conversation(s) and context/subject matter is limited to the representations/dialogue present. Dickey's opinion is that there is a start/stop in the conversation on recording N-17.

## LEGAL ANALYSIS

**A.    MOTION TO SUPPRESS.**

Before a tape recording may be properly admitted at trial, Federal Rule of Evidence 901(a) requires the government to offer evidence sufficient to support a finding that the [tape] in question is what its proponent claims.' " United States v. Eberhart, 467 F.3d 659, 667 (7th Cir. 2006) (quoting United States v. Westmoreland, 312 F.3d 302, 311 (7th Cir. 2002)). The government satisfies this requirement by offering clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of the conversation between the parties. Id; United States v. Carbone, 798 F.2d 21 (1st Cir. 1986)

(the United States is to establish that the recordings are accurate, authentic and trustworthy). The government may meet this burden by offering evidence establishing the tape's chain of custody or the testimony of an eyewitness that the recording accurately reflects the conversation that he or she witnessed or evidence establishing the chain of custody. Id; United States v. Emerson, 501 F.3d 804 (7th Cir. 2007)

In determining whether there was a sufficient showing of accuracy to warrant admissibility, we must keep in mind the governing standard: the possibilities of misidentification and adulteration (must) be eliminated, not absolutely, but as a matter of reasonable probability." United States v. Haldeman, 559 F.2d 31, 106 (D.C. Cir. 1976); Gass v. United States, 135 U.S.App.D.C. 11, 14, 416 F.2d 767, 770 (1969).

Armstrong claims tape N-17 was edited or altered, and he called an expert (Griffin) to testify at the evidentiary hearing that there were anomalies, edits, and pauses on the N-17 tape. The Government rebutted with two experts (Johnson and Dickey) and expert Dickey testified that nothing on the tape N-17 indicated tampering.  Dickey believes that it is too subjective to suggest that one start/stop in a conversation necessarily indicates that there was tampering with the recorded conversation.

Upon a careful review of all of the experts' opinions in writing and their testimonies at the evidentiary hearing, we find the government has not presented clear and convincing evidence that tape N-17 is a true, accurate and authentic recording of the conversation , at a given time, between the parties involved.

It is uncontested that all the experts agree that N-17 is not a recording of a complete conversation.  In fact, expert Dickey, for the government, stated N-17 contains two

<u>United States of America v. Adrian Armstrong [2]</u>
Civil No. 04-250 (Jag)
Report and Recommendation
Page 8

anomalies which question its integrity as a continuous recording of a single conversation. The segments existing between {00:23 – 03:34} and {03:34 – 07:04} are independently continuous.  In addition, Dickey testified he cannot estimate the length of the stop/start. Dickey was questioned on this matter on cross-examination by defense counsel as follows:

Q      Sir, and please bear with me because I am not scientifically inclined.

       The truth is that, on N-17, the content you have is two fragments of a conversation or two, different conversations?

A      Could you be more specific?

Q      Yes. Now, you have said that, when you analyzed the tape, there is a stop/start at zero, zero point twenty-three, correct?

A.     That is the start of the conversation, correct?

Q      Yes, there is a stop at three, thirty-four?

A      That's correct.

Q      And, then it restarts and goes on to seven minutes 'o' four?

A      That's correct.

Q      Now, so you have either one conversation that was cut in the middle or you have two fragments . . . you have two fragments of the same conversation? That could be one possibility?

A      That's correct?

Q      Or it could be two, different conversations? You cannot . . . you don't know that?

A      It cannot be verified positively, no.

Q       Very well.  Isn't it correct also that, at seven 'o' four, at the end of this tape, the conversation ends abruptly?

A       Yes, as I stated earlier.

Q       Now, so neither of those two conversations in that tape you don't know or you cannot testify to?  The truth is that none of them is a complete conversation?

A       You're saying "none of them."  Could you restate it?

Q       Well, like I said, you have one from three . . . from point twenty-three to three, thirty-four.  You have another one from three, thirty-four to seven 'o' four.

And you cannot state, for the record and to the Court, that those are complete conversations?

A       That's correct, they're independently continuous.

Q       Very well.  Now, and you already stated that you cannot estimate the length of the stop/start?  And, I'm repeating it because I want to be clear.

You don't know, when that tape was stopped at three point thirty-four, how long that stop was, what's the duration of that stop?

A       Yeah, I cannot positively verify that.

(Tr. 9/25/08, pp. 18-20).

Thus, based on the testimony of the government's own expert witness (Dickey) as above quoted, the government has not been able to establish that N-17 is the recording of a complete conversation.  In fact, expert Dickey refers to the conversations as "independently continuous" so there can be more than one conversation.  In addition,

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 10

Dickey admitted, in relation to the stop-start during the conversation(s), that he cannot estimate the amount of time which elapsed during the period from the stopping of the tape and the amount of time that elapsed before it restarted. (Tr. 9/25/08, pp. 14-15). Thus, there is a gap in the conversation which is unaccounted for.

Similarly, Johnson (additional expert for the government) agreed that there was a stop-start at three minutes thirty-four seconds, that there is no way to determine the length of the stop-start and that it could have been done intentionally. (Tr. 10/9/07, pp. 74-78 and 110-111).

This was confirmed by defendant's expert witness Griffin who testified that there is a break in N-17 in the middle of the recording, likely the result of a stop and start or the possibility of later editing or over recording. (Tr. 10/9/07, pp. 18-19). As argued by defense counsel, the recording could be a partial recording of a single conversation or a partial recording of two different conversations.

The main disagreement among the experts is the cause of the stop-start. Griffin, on behalf of defendant, understands N-17 was edited or altered due to the anomalies, edits, and pauses on the N-17 tape. In turn Dickey, for the government, testified that nothing on the tape N-17 indicated tampering. Dickey believes that it is too subjective to suggest that one start/stop in a conversation necessarily indicates that there was tampering with the recorded conversation. Dickey indicated that there are other plausible explanations for the start/stop in the recording, such as possibility that the recorder did not function properly during activation or that some failure may have momentarily occurred.

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 11

Regardless of the cause of the stop-start, it is uncontested ---as agreed upon by all the experts-- that there is a gap in the conversation which length cannot be estimated. Thus, it cannot be asserted the N-17 tape is a true and accurate recording of the conversation between the parties.

Moreover, we also note that all experts agree that there is an abrupt stop at the end of the N-17 tape in the middle of a conversation while the conversation still appears to be in progress after approximately seven minutes and four seconds. (Tr. 10/9/07, pp. 13 and 21 (Griffin) and pp. 111-112 (Johnson); Tr. 9/25/08, p. 14 (Dickey)). Thus, all experts agree the conversation is incomplete.

In addition, expert Griffin opines that the N-17 tape has a partially erased date of December 27, 2003 as a header. Expert Dickey disagrees based on his analysis. To this effect, Dickey explained that even though there was an anomaly because there was a break in the middle of the header, he concludes there was no over-recording or an intentional erasure but a malfunction in the equipment. (Tr. 9/25/08, pp. 10-13 and 23-24).

Regardless of the above discrepancy among the experts as to a possible erasure, as to the date of the recording being December 27, 2003, we note the government's Report of Investigation of January 8, 2004 (Exhibit F) indicates the conversation included in N-17 took place on January 7, 2004 and not on December 27, 2003, as the header of the tape shows. (Exhibit H - transcript of conversation). Thus, there is an inconsistency on the date of the conversation and the government has failed to provide an explanation for this discrepancy which militates against N-17's reliability.

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 12

Furthermore, the government in an attempt to meet its burden has not offered evidence establishing the tape's chain of custody or the testimony of an eyewitness that the recording accurately reflects the conversation that he or she witnessed or evidence establishing the chain of custody. United States v. Emerson, 501 at 804.  No evidence was presented by the government at the evidentiary hearing to properly establish the chain of custody.  As properly argued by defense counsel, the government chose not to present the testimony of Young-Duffis, the cooperating individual, who could have testified as to the authenticity and continuity of the conversations in question.  In fact, expert Johnson, for the government testified, that "the only person that can speak to that [start-stop] would be the confidential informant and the person on the other side of the conversation."  (Tr. 10/9/07, p. 110).

Finally, the conversation in tape N-17 is in a foreign language and the government introduced as an exhibit at the evidentiary hearing a transcript of said conversation. (Exhibit H).  A reading of the transcript shows that there are some gaps in the conversation or conversations in accordance with the start-stop indicated by the experts. At page 3 of Exhibit H, the CS asks twice "Ruddy" whether he knows "Roger from Ocho" and there is no answer to that question.  The conversation resumes on another subject related to the payment of money in which "Ruddy" asks the CS what he wants him to do with the money. This gap in the conversation is consonant with the stop-start mentioned by the experts at 3:34 minutes which the experts agree that it is impossible to know how long the stop was.

In view of the above, the government has not met its burden of showing by clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 13

the conversation between the parties. Thus, under the totality of the circumstances and taking into account the testimonies of the expert witnesses, we opine that the N-17 tape recording contains several anomalies which makes it unreliable.

Accordingly, it is recommended that defendant's request that tape recording N-17 be **GRANTED** and the same be suppressed.

## B.   MOTION TO DISMISS INDICTMENT.

The Supreme Court has not foreclosed the possibility that the government's active participation in a criminal venture may be of so shocking a nature as to violate a defendant's right to due process, notwithstanding the defendant's predisposition to commit the crime. *See* United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1642-43 (1973); *see also* Hampton v. United States, 425 U.S. 484, 491-95, 96 S.Ct. 1646, 1650-53 (1976). While acknowledging the possibility that the government might in some hypothetical circumstances go too far, the First Circuit in  United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990) stated that is has yet to review a situation where official conduct crossed the constitutional line; rather, an unbroken string of First Circuit cases has repulsed attempts to win dismissal of criminal charges on such a theory. United States v. Panitz, 907 F.2d at 1272; *see*, e.g., United States v. Porter, 764 F.2d 1, 8 (1985); United States v. Rodríguez Ramos, 704 F.2d 17, 22 (1st Cir 1983); United States v. Parisi, 674 F.2d 126, 127 (1st Cir. 1982); United States v. Caron, 615 F.2d 920, 921 (1st Cir. 1980); United States v. Johnson, 565 F.2d 179, 181 (1st Cir. 1977).

Other Circuits have recognized that "[w]hile there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process bars the government

from invoking the judicial process to obtain a conviction, the level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008).

"Whether outrageous government conduct exists 'turns upon the totality of the circumstances with no single factor controlling' and the defense 'can only be invoked in the rarest and most outrageous circumstances.'" United States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir. 1984) (quoting United States v. Tobias, 662 F.2d 381, 387 (5th Cir. 1981)). "Although federal courts possess the authority to dismiss an indictment for governmental misconduct, dismissal is an 'extreme sanction which should be infrequently utilized.' ... Dismissal is only favored in the most egregious cases." United States v. Sims, 845 F.2d 1564, 1569 (11th Cir. 1988).

A review of the alleged government misconduct in this case for the alleged tampering by a cooperating individual of the evidence does not come close to the level of egregious unacceptability that would be necessary to implicate the Due Process Clause. The reasons for which we find that N-17 is unreliable, as explained above, do not amount to outrageous government misconduct which was pervasive undermining the integrity of the investigation. Moreover, the defense has not presented credible evidence that the recording in question N-17 was intentionally tampered with. Furthermore, defendant will not be prejudiced inasmuch as we are recommending tape N-17 be suppressed. Suppression of tainted evidence at trial is an appropriate remedy sufficient to cure any prejudice to Armstrong resulting from the admission of N-17. *See* United States v. Fortna, 796 F.2d 724,

732 (5th Cir. 1986) (quoting <u>United States v. Morrison</u>, 449 U.S. 361, 365, 101 S.Ct. 665 (1981)) for the proposition that the "remedy characteristically imposed" when the government obtains evidence in violation of the Fifth or Sixth Amendment "is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongly admitted"); <u>United States v. Haynes</u>, 216 F.3d 789, 797 (9th Cir. 2000).

Hence, based on the totality of circumstances, it is recommended that defendant's request for the dismissal of the Indictment, based on alleged outrageous government misconduct, be **DENIED**.

## CONCLUSION

In view of the foregoing, it is recommended that defendant's Motion to Dismiss of for Exclusion/Suppression of Evidence and related requests (Docket Nos. 146, 172 and 225) be **GRANTED IN PART AND DENIED IN PART** as follows: the request for the suppression of the N-17 recording be **GRANTED** and the N-17 tape recording be suppressed; and the request for the dismissal of the Indictment based on alleged outrageous government misconduct be **DENIED**.

**IT IS SO RECOMMENDED.**

The parties have ten (10) days to file any objections to this report and recommendation.  Failure to file same within the specified time waives the right to appeal this order.  <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-151 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d 4 (1st Cir. 1986).  *See* <u>Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and

United States of America v. Adrian Armstrong [2]
Civil No. 04-250 (Jag)
Report and Recommendation
Page 16

the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint

and weave at the initial hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 30th day of December, 2008.

s/ CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE